Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good afternoon. We are here for oral arguments in Jeffrey Lee v. Greg Lovelace, the Commissioner of the Alabama Department of Corrections, case number 26-11864. Ms. Sharpe, whenever you're ready. Good afternoon and may it please the court. Paige Sharpe, representing the appellant, Jeffrey Lee. The Supreme Court, as well as this court, has said that execution by conscious suffocation violates the Eighth Amendment. Conscious suffocation is exactly what the district court found here. But the court, nevertheless, found that conscious suffocation does not create a substantial risk of a severe harm. That legal conclusion is subject to this review is wrong and should be reversed. I have three points that I want to make, and I will turn to each of them in turn. Number one, execution by conscious suffocation is constitutionally impermissible. Number two, the district court found conscious suffocation. Number three, firing squad is feasible and readily implemented and would substantially reduce the substantial risk of severe pain. And then I plan to briefly address our motion to stay after addressing these points. So I will begin, your honors, with the legal framework. The question under the Bays, Glossop, and Bucklew trilogy is whether a method of execution poses a substantial risk of serious harm, alternatively phrased as a substantial risk of severe pain. In the history of the Supreme Court's death penalty jurisprudence, when the court discusses unconstitutional methods, it typically cites barbaric practices that have long since fallen by the wayside, drawing and quartering, playing alive, the rack. But there is one type of suffering in the modern era that the Supreme Court has said poses a constitutionally unacceptable risk. And that type of suffering is conscious suffocation. It was addressed in the Bays case. In Bays, the court considered an Eighth Amendment challenge to a lethal injection cocktail. One of the drugs was a paralytic agent that could cause conscious suffocation, if not accompanied by an effective sedative. In the controlling opinion, Chief Justice Roberts wrote that absent the administration of a second sedating drug, quote, there is a substantial, constitutionally unacceptable risk of suffocation. In other words, conscious suffocation is constitutionally unacceptable. And two dissenting justices in Bays agreed. This court has recognized the significance of that statement from Bays in the very context of nitrogen hypoxia. In Grayston v. Commissioner, this court reviewed a nitrogen hypoxia challenge in the preliminary injunction setting. The trial court had written that conscious suffocation does not necessarily create an Eighth Amendment problem because of the method of execution at issue in Bays, which was lethal injection. But this court disagreed. It held that, quote, a substantial risk of conscious suffocation can create an Eighth Amendment problem regardless of the method of execution being used. In other words, the constitutional problem of conscious suffocation recognized in Bays does not solely apply in the lethal injection context. It applies to all methods, including nitrogen hypoxia. Sharpe, for purposes of your constitutional challenge to the protocol, do you take issue with any of the district court's underlying findings of fact? We do not agree in full with all of the court's findings of fact. However, we do not believe that it's necessary to reach any of those disputed facts in order to find in Mr. Lee's favor. Tell me, just without arguing them, but tell me which are the critical findings of fact that you take issue with. There is a finding of fact with respect to time to loss of consciousness of one to three minutes, where we believe that the factual evidence established a longer period of three to seven based on the testimony of Dr. Basterach. That would be the primary one. Okay, you can continue. Thank you. Thank you, Your Honor. The petitioner and Grayson lost, but that was because the evidence did not meet the standard for preliminary injunction. Specifically, the evidence did not show conscious suffocation. But the record here is different, and the findings of fact are different. And that leads me to my second point, which is that the district court found conscious suffocation. The court found that death from deprivation of oxygen, which is the very method, the mechanism of action with respect to nitrogen hypoxia, meets an accepted medical definition of suffocation. The court found that an inmate executed under the protocol, quote, consciously experiences air hunger. That's the most severe form of breathing discomfort. The court found that air hunger is akin to feelings of suffocation, to drowning. It's akin to some of the worst suffering, the worst pain imaginable. And the court found that severe air hunger begins early in the execution process and lasts one to three minutes, if not a little bit longer. The court did not speak in maybes, possiblys, or probablys. The court did not say that this could happen or that it happens in some cases. The court said that across the board, this is what an inmate suffers when being executed by nitrogen hypoxia. Under Bays and Grayson, having found one to three minutes of conscious suffocation, the district court should have found the method of execution presents a substantial risk of serious harm and proceeded to evaluate our proposed alternative method. The trial court reached the wrong conclusion based on her own factual findings. The district court said in part that Mr. Lee hadn't shown that any suffering was well beyond what's needed to effectuate a death sentence. And I'm reading from page 56 of the order. Tell me why you believe that that is erroneous. We believe that that as a legal conclusion, her own factual findings do not support that. And we're basing that on her findings that an inmate suffers severe air hunger, along with extreme emotional and psychological suffering, along with severe physiological distress and physical discomfort on the order of one to three minutes. That is not suffering that is needed to effectuate a death sentence. It is suffering that is inherent in this method of execution. How does that compare to the gas chamber? And when you say cash chamber, your honor, do you mean the gas chamber used in Nazi Germany or? I think we both know what we're talking about. Okay. Well, yes, your honor. I mean, that's a fair analogy. It's execution using a gas. And I don't think that anyone would think that execution by a gas chamber would pass muster under the constitution. Yet two circuits said that it did, right? I'm not aware. I'm not aware of that, your honor. I apologize. I don't have those sites. Okay. You don't agree that that multiple circuits have approved using what is colloquial term, the gas chamber in order to effectuate execution, specifically the fifth and the fourth. I'm not aware of those cases being cited in the record, your honor. I apologize. Okay. And there's one, if I'm not mistaken, there was one, an opinion that was vacated on other grounds later, the ninth circuit struck it down before that opinion was, was vacated too. So I think there were three opinions on the subject from circuit courts, at least. How about hanging? Your honor, hanging has never been found unconstitutional. However, it's not a method of execution that's been employed in some 30 years. It's the method that states have moved away from. I think that's well-established in Supreme court jurisprudence. Right. But the fact that it doesn't, that they're not using it doesn't make it a historical analogy for which the Supreme court has itself used in the very cases, which you've cited to us and B stands for the stands. The question of what about hanging? In other words, you're you're the answer to you gave to, to my colleague is this level of pain that the district court found for her facts are unnecessary in order to effectuate an execution. I think that's almost word for word what you said. And I've asked you about one method of execution for what you're unfamiliar with, although it's been approved by at least two circuits, and that would seem to call for the same thing. And now I'm asking about another one. So tell me about why that analogy is not inapt or apt here. So I believe that hanging is an inapt analogy and that's because the suffocation that could occur with hanging execution is not part of that method of execution. If it works as it should, it is a quick and relatively painless method of execution. It is only the same. Couldn't the same be said for this? In other words, part of part of your record here, part of what you've alleged and what the record here is, is as done per this particular protocol or for some people, it is less effective. Otherwise, it would be very quick. But as propagated by Alabama and has done here, some people suffer more than other people do based on how it's specifically done. How is that not similar to hangings, which by their definition, cut off the air in which you can no longer breathe, for which some people suffered for minutes before they they expire? Yes, Your Honor. So when hangings go awry, that is when the suffocation can arise. The factual record establishes here that suffocation is an inherent and escapable part of the method of execution. The district court's findings show that this happens across the board, that every inmate will experience the cascade of terror, panic, physiological stress, physical discomfort. Every inmate. It's not an idiosyncratic method of execution. This is something that applies across the board and is inherent in the method, unlike hanging. In other words, suffocation here is the method by which individuals are put to death. In hanging, if the protocol is carried out correctly with the right amount of the drop, given the weight of the person and the height of the person, the protocol is supposed to sever the spinal cord upon the drop. It's when the and you think that's what makes the difference between the two methods. You encapsulated it perfectly, Your Honor. I agree with that entirely. And yet the Supreme Court has time and again said that that is not always how hangings were done and yet did not call it into question, right? What the district court or the Supreme Court said in is that hangings frequently involved some suffocation when they were done historically because of the techniques involved at the time. I think if you look at the Ninth Circuit, when it addressed this more recently in 1994, and I think it's the Campbell case, they only allowed hanging to proceed and only found it constitutional because there was a developed factual record that Washington's protocol for hanging would in fact result in quick and painless death. All right, let's talk about electrocution. Electrocution, you would agree, does not result in immediate and sudden death, correct? I would agree with that. Okay. In fact, we know there are cases from the Supreme Court where someone actually was fully electrocuted, it was unsuccessful, and then it happened again, correct? There have been instances of unsuccessful lethal injection, electrocution executions. Right. How do we compare those where, again, the point is the pain, in other words, the point is to truly fry someone from the inside out with what we're talking about here? I think I would respectfully disagree that the point is ever the pain of an execution. No, that it's inherent. Let me be clear, and what I'm trying to do is use the same language that you yourself have used, that pain is inherent in the method. In other words, that because we are killing someone, pain inherently comes with the killer. I understand that, Your Honor, and I agree that the Supreme Court has said that the Constitution does not guarantee a pain-free death. The question is whether it's super added. The question is whether there's a substantial risk of a serious harm or severe pain. And I think, again, in the electrocution context, or you can cite the lethal injection context, or you can cite firing squad, there are instances when those can go wrong, and someone can suffer more than the execution method was designed to do. Well, no, let me be clear. Inherent, and that's why I asked the question about electrocution and not some of the others you've just raised. The death is not Southern. I think you agreed to that, and I think that's a fair agreement. Where that's not, and yet where both the Supreme Court and this court have repeatedly said that that is not an execution method that violates the Eighth Amendment, how do we square that with the psychological or emotional pain that is resonant here? Well, first of all, I think the record shows that there's more than just psychological and emotional pain involved in this execution method. There's severe air hunger and all of the attendant consequences. Right, but that is the consequence of air hunger. In other words, everyone agrees this is both found and the experts say it's not pain in any sort of sense. It is the desire, the psychological desire to want to breathe. That is the terror that comes with that. So let's not quibble over that. My ask is where you have someone who is, electricity is pumped through their body for some period of time until they die, let's call it 60 seconds to 90 to 120 until they expire. How is that different from this? Well, I would just direct your honor back to the court statement in Bates where it says conscious suffocation is constitutionally unacceptable, and that is what we have here. We have conscious suffocation. The court has distinguished that as a method of suffering, a type of suffering that is different, and that is exactly the type of suffering that conscious suffocation is the very type of suffering that nitrogen hypoxia executions cause by their very mechanism of action. So I just want to be clear though, only by dint of the Chief Justice Roberts opinion are we talking about that. So in other words, there's no constitutional principle that differentiates the things that I'm asking you about in this. There's nothing in the eighth amendment. There's certainly nothing in the history. It's simply because the Chief Justice mentioned the term suffocation in Bates, which made its way into an opinion in our court for which you establish a constitutional principle. I just want to pin it down. No, your honor, I wouldn't agree with that. That is a specific reference to conscious suffocation that makes it very clear that this falls within an area of, you know, suffering that the court has said would be constitutionally unacceptable, but it meets the standard, the overarching standard of a substantial risk of severe pain or serious harm. I just, I know you say that, but I'm asking you about, and I still haven't gotten an answer with regard to electrocution, about how do distinguish those two? In other words, where someone is electrocuted for 60 seconds, 90, 120, in order to effectuate death and pain results from that, how do I distinguish that from pain that results from here, where nitrogen is pumped into your lungs for 60, 90, and 120 seconds, and you experience psychological and emotional terror from being unable to breathe as a result of that? Well, your honor, again, because this is in the very method by which this functions, I think that is the distinction because it is the mechanism of action here in causing the suffocation, whereas in other methods of execution, it is a side effect essentially at times, depending on the execution method, or it is something that has gone awry, and that is not what we have here. Beyond that, I would note that I think the district court's findings establish more than just emotional or psychological suffering, and I would point you to the end of her opinion when she finds a panoply of types of suffering that are associated with severe air hunger, physiological crisis, physical discomfort, so it goes beyond that, and even the anxiety that she described is in a degree and kind that is different than what you would have in an ordinary or in every execution. She herself describes it as unique and stemming from the underlying physiological processes that are taking place during nitrogen hypoxia. With regards to the comparison to electrocution, is the right comparison the amount of time that electricity might be sent through to the inmate, or the amount of time that it takes for the inmate to be rendered unconscious? I think that could be a distinguishing factor as well, your honor. Here we have a record that establishes one to three minutes of conscious suffocation and suffering. But you don't agree with that. I mean, in both your brief and argument to the district court and in evidence you presented, you believe that one experiences pain despite consciousness. In other words, consciousness isn't the measurement, pain is the measurement, and that continues in an unconscious state. I mean, you don't agree with what Judge Jordan just said, right? Well, I think it's very fact dependent. I think you can be rendered unconscious, and this is in the record as well, by something like firing squad to such a deep level of consciousness that you're not experiencing pain. What Dr. Schwartzstein testified- Well, that begs the question of the deep conflict between your own two experts. But despite that, the question, the key that Judge Jordan asked you about was simply, is the measurement stick on consciousness? And the answer that you gave below, and that you've given us in brief, is no, that's not the measuring stick. The measuring stick, in fact, is pain, and pain, in this case, exists despite that. And so, wouldn't that be the case outside of firing squad for any other method of execution that renders unconscious until death occurs? Well, we have a fully developed record on firing squad because that was an alternative method that was alleged by Mr. Lee. I would just note that even accepting that the district court's factual findings is true and that there's not suffering or that it doesn't meet the constitutional definition of suffering or conscious suffocation for a constitutional violation with respect to this unconscious period, this court should still find that there is this one to three minutes of conscious suffocation. I don't think you'd actually need to reach the unconsciousness question to find for Mr. Lee here. And one other note that I would just make on conscious suffocation is it's not just a throwaway line in the Bayes' opinion. It's something that this court has cited as applying across all methods of execution in the Grayson case. So, it has- When your client sued in 2016, I think, is it 2016 or 2018? I apologize if I have the date wrong, but one of those two. When your client sued the first time based on method of execution for the lethal injection, what alternative method of execution did he propose? He proposed a drug protocol, a cocktail. That was different than the one that Alabama was using at the time? I believe that's right, yes. Okay. And when Alabama passed its statute allowing inmates to select nitrogen hypoxia as an alternative method of execution and giving inmates the choice for, I think it was a 30-day window as I recall, your client selected that, right? That's correct. Why is that? Why did he elect nitrogen hypoxia? Right. Well, at the time, the state of Alabama was providing assurances to inmates that this would be a quick and painless alternative. It had not yet developed its protocol, but it was giving that assurance. And there was also a record- There has been a record in Alabama of things going awry with lethal injection. So, I think a number of inmates made the election along with my client at the time, given those two factors. So, I just want to be clear. If the assurance had been true, let's assume for the moment it's not. If the assurance had been true, we wouldn't be here. In other words, there is a constitutionally appropriate way for which your client would have elected and would have wanted to die by nitrogen hypoxia, right? I think that's a fair statement, Your Honor. It's the record of what's happened during these nitrogen hypoxia executions, as well as the developments in the literature over the past two years that form much of the evidentiary basis for this release of- Tell me what would be perfectly appropriate. In other words, this method, if it's inherent to have some suffocation, what's appropriate? Well, Your Honor, I think that the alternative we alleged is firing squad, not an alternative- Well, no, I understand that, but I'm talking about- We're talking about in 2023 when your client elected this. Tell me what would have been appropriate. What's an appropriate level of suffocation for him under the Eighth Amendment? Well, Your Honor, I don't think that there is an appropriate level of conscious suffocation under the Eighth Amendment. I guess that's the question. How would your client possibly elect this and say that this is a way I wanted to die and then say that it's not just that the way that it's done here is inappropriate? I wouldn't agree. There is simply not an appropriate way to do this. How are those two things consistent? I think that the record of what happens during these executions, how long they take, the significant air hunger that inmates are experiencing, and all of those attendant consequences are things that have developed in the evidentiary record after the adoption of the protocol and after Alabama began to execute inmates using this method. All right. I think there are no more questions at least for this part of your argument, Ms. Sharp. Thank you very much. You've saved your time for rebuttal. Thank you. Mr. Overing, whenever you're ready. May it please the court. Robert Overing for the State of Alabama. The court has heard and rejected this same theory of emotional distress twice, in Grayson and in Boyd, and the Fifth Circuit rejected it in Hoffman. Lee has now tried that same theory to verdict and he lost because at most his experts persuaded the court that an inmate could be conscious for up to three minutes. Unfortunate, the district court said, but not unconstitutional. Lee pitched a strange new theory that a person can still process hypoxia even after he's unconscious, but there's no precedent for that. It would call into question every lethal injection, execution, and even the premise of anesthesiology that an unconscious patient feels nothing. This scientific novelty about which his own experts disagree is no ground for an injunction pending appeal. Lee's last ditch gambit is to disqualify the single most prominent expert in Eighth Amendment cases, Dr. Antonini, but even if the court did that, Lee wouldn't have a chance of success because the district court relied critically and repeatedly on the hard science underlying Dr. Antonini's opinions, not just his expertise. Can I ask you a question about him before you get to the merits of your Eighth Amendment argument? In its memorandum opinion, but not in its Daubert order, the district court said that Dr. Antonini had not provided an explanation for his extrapolation. That's on pages 44 and 45 of the district court's order. Can you tell me why that's not problematic for you? Well, all the expert has to do is show a scientific relationship between the pertinent facts and his conclusions, and Dr. Antonini amply satisfied that here. Don't we have cases, though, that say that when you extrapolate, you at least have to provide an explanation for the extrapolation, and the Supreme Court's decision in General Electric versus Joiner says that that explanation has to be more than the expert's Ipsy Dixit. And so here, the district court says, this is page 45, Dr. Antonini did not explain whether or to what extent he accounted for this distinction in forming his opinion. Further, regarding the Ernsting studies and suicide case reports, he did not articulate whether or to what extent he accounted for the fact that the subjects received breathing instructions and took deep breaths of inert gas, despite his acknowledging that inmates in the execution context are not giving any instructions in terms of exhaling or exhaling. And he also acknowledges that the subjects in the suicide case reports were voluntarily ending their lives, which differs from the execution context. While extrapolation is permitted, the expert must provide a sufficient basis for the extrapolation. And the district court found that there was no explanation for the extrapolation. So tell me why you think that his opinions still stand. So Dr. Antonini acknowledged that those studies, particularly the suicide studies, the pilot studies, and the workplace fatalities, don't map on perfectly to the execution context. But at the same time, plaintiff's experts have to make the same kinds of extrapolations. I'm not talking about the plaintiff's experts right now. I'm talking about Dr. Antonini. So tell me how he explained that despite the differences, it was fair for him, reasonable for him to extrapolate. Well, so I do think that that general statement that you read from the district court is a bit overstated because in Dr. Antonini's rebuttal report, for example, on the pilot studies, he showed graphs and gave paragraphs describing how he believed the barometric pressure and high altitudes would not impact his opinions to such a degree that they would change his ultimate conclusion in this case. So he acknowledged those objections. He was cross-examined on them. And it's true, we don't have a study that will convert by a formula the time to unconsciousness in a suicide to a judicial execution because that study can't be done. We don't have randomized control trials of judicial executions. And so we're using the best evidence available. And the district court found exactly that, that Dr. Antonini used scientific literature and drew inferences from them. Now, was that the only counsel? Was that the only basis for Dr. Antonini's opinion? Was it just the Were there additional observational or other data points for which he specifically relied on in rendering his opinion? So a big one for the district court in this case was video evidence demonstrating the Alabama and Louisiana systems, and in particular, how quickly oxygen is reduced in the mask to almost zero in about 30 seconds, certainly under a minute. And so the district court found that that was highly probative and credited our expert over plaintiff's expert, Dr. Bastarach, who thought that if it's not exactly zero, that that would create a prolonged period of unconsciousness. But that itself is an extrapolation because Dr. Bastarach, Dr. Schwartzstein, they didn't conduct studies on low hypoxic patients. They didn't certainly conduct studies on judicial executions. So we think given the deferential standard of review here, the language in Brown versus United States from this court gives the district court a lot of latitude, even more so than on other evidentiary issues. And Dr. Antonini's testimony has been credited time and again by this district court, but courts across the country and cited by the there's no question that these objections can go to the weight of his opinion and the district court properly apply that discounting when it was appropriate. That's also why we think there's no likelihood of success if this court were to reverse on Daubert grounds, because the district court already took those objections into account and relied primarily on the data underlying the opinions, not the ipsy dixit of Dr. Antonini. What does it mean when the Supreme Court says acknowledges that there's no such thing as a painless death, that there's some pain inherent in the act of execution? What does it mean by that? So I think that line is a better interpretation of the principle underlying the modern doctrine than the inescapable consequence language from Bayes, which is a little bit confusing. There are different pains with different types of methods. As your honor was exploring with opposing counsel just now, there are pains in electrocution that don't exist with nitrogen hypoxia. There are pains with hanging that don't exist with nitrogen hypoxia or any other method. And so there's some degree of pain which is constitutionally tolerable. And then there's a degree which is intolerable. And they've got to satisfy that test on the base point. There's no such thing as a unconstitutional kind of pain. I think that sentence from the chief justice is dicta because it just wasn't at issue there what could be done while the patient was conscious. And so they have to ultimately satisfy the Buckley test, which was an implementation of the principle that you just said that some amount of pain is tolerable. I'd also like to clarify if a firing. Can I ask you hypothetical? If a firing squad protocol called for a shot or shots somewhere other than the region of the heart and just provided for the inmate to bleed to death over a course of minutes, would that get closer to an eighth amendment violation in your view or not at all? Under the current test, I think there's some ambiguity about the role of intent in the analysis. Ultimately, the doctrine is trying to get at the deliberate infliction of pain. And so if the instructions were the firing squad needs to miss that, they're told they're told where to shoot, but it's not in the heart area. And so by design, by design, the intent of the firing squad the protocol that I'm suggesting to you in this hypothetical is that the inmate will bleed to death over a course of minutes. And I'm asking you if that gets closer to the eighth amendment line in your view or not. Well, is there then a firing squad or a regular firing squad where the, where the intent is you have four, five, six, seven marksmen shooting at the area of the heart so that death occurs within, you know, six, seven, eight, nine seconds, whatever, whatever the time period is, but occurs within that length of time, as opposed to bleeding to death over a course of minutes. Yeah, I think the answer to the hypothetical is, is yes, at the length of time can be a factor within the Bucklew framework, it would go to the of pain, but we're nowhere near that here. And I, isn't the intent here to have the person experience severe air hunger for one to three minutes? No, the intent was the intent and the, the, and the state's view of the evidence one to three minutes is generous to plaintiffs. And in this case, that's what the district court filed. I'm not trying to re-argue the record for you. The district court said one to three minutes, it rejected the plaintiff's contention through their experts that it was somewhere around six or seven. It rejected Dr. Antonini's position that it was as low as 45 seconds. So it said one to three, I'm taking the district court findings as they are. Isn't the, isn't the intent of the protocol to have someone suffer air hunger for one to three minutes resulting in death? No, your honor. And I think this is an important distinction. What the record showed or what the district court found in this case is not equivalent to the subjective intent of the state and state officials when adopting the method. And so we, the state disagree with that finding of, of one to three minutes. And I think this illustrates how, when you have a scientific controversy, right, we've litigated this now half a dozen times and the evidence is a little different. In this time, this case, the district court found that plaintiff's expert was a little bit more credible than in some past cases, but not fully credible. She didn't credit the seven minutes or 12 minutes or unconscious brain suffering. This reflects a scientific controversy that, uh, that is, is not a basis for an eighth amendment injunction. It's not objectively a matter of scientific consensus that an inmate will suffer severe air hunger for up to three minutes. And the best thing I can work. So you think, so you think that finding a fact by the district court constituted clear error, despite the fact that one expert testified to it. We do think that, I mean, it's not necessary to resolve this appeal or the injunction pending appeal, but, um, when we, if we litigate the consolidated cases to verdict, um, you know, we will absolutely challenge that finding once again. And following up on that, can you, uh, break that out? Do you disagree with the finding that an inmate who is executed under the protocol experiences severe air hunger and corresponding emotional distress, anxiety, physiological stress and physical discomfort separating that out from the time? Do you disagree with that finding? We do disagree with that. Um, the there's evidence in the record, I think from experts on both sides that the degree of dyspnea can vary from patient to patient, from inmate to inmate, and that the court assumed without deciding that it would be constant throughout the execution, but that's simply not true because the amount of oxygen in the lungs at the beginning of the execution versus the end is different. And their own experts testified that, um, the more oxygen deprivation there is, the more likely you will experience dyspnea. So we, we contest that finding as well. But again, we don't think it's necessary to resolve in this appeal and for this injunction pending appeal, um, because at the end of the day, the three minutes, um, bears no resemblance to any of the methods deemed cruel and unusual, um, through history and as much. Can I go back to my colleague's question? Cause I think one, one aspect of it got muddled. There's, there's the, the finding itself, and I'm actually asking, I'm not telling there's the finding itself of the one to three minutes. And then there's the separate question that I thought my colleague asked about intent. Did, am I missing something to the district court say that the intent of the state and implementing in both implementing nitrogen hypoxia generally, and implementing this protocol was for the inmate to suffer from one to three minutes, or just that that is the natural consequence of the protocol for which the state has implemented your honor. You've broken it down correctly and opposing council has said this is inherent and by design and things like that. And no, the, the state's view is that, um, an inmate breathing normally will become unconscious. I'm sorry. I'm sorry to interrupt. I'm not asking about the state's view. I'm asking about the actual district court's findings here. Did the district court find anything regarding intent, the subjective intent in the state in implementing this particular protocol? No, I don't think we have a finding of intent. Um, so to the extent the eighth amendment test is sensitive, uh, 10, 10, I don't think that, um, burden is, is met here. Um, but so, so it's neither here nor there, but I just want to get there. Well, neither here. I'm not sure it's neither here nor there, but, but let me ask this as I understand. And I've been involved in a few of these cases. Um, as many of us have, as I understand the sort of the operating assumption going into this from everybody, by the way, from the, the, the defense side and the state was, this was a method by which somebody immediately was deprived of oxygen, immediately passed out and painlessly suffered. That was, as I understand, that was sort of the intent of this. Was it not now, whether it can be done that way, whether it is done that way but was that not the, the operating assumption of the state in, in sort of picking this model after the lethal injection protocol had been challenged time and again? That's correct. And I'm just clarifying that that remains the state's view after these, uh, half a dozen executions using the protocol and the one in Louisiana, um, most of the media reporting about the movements, uh, the, the state stands with its expert testimony that that occurred after unconsciousness and no, there's not a period of severe discomfort or distress attributable to breathing nitrogen gas. But it was the state's intent that this protocol, uh, deprived the, the individual of oxygen, correct? Correct. And the district court simply found that as a consequence of that decision, um, that the person will necessarily essentially experience severe air hunger. Uh, that's what the district court found, right? The court said likely experience air hunger. And I'd like to push back on some of the metaphors, you know, in the reply brief that they're quoting hospital patients, uh, under completely different patients who expect to live and feel that prolonged shortness of breath for many days at a time, often with mechanical ventilation, which can exacerbate dyspnea often with additional diseases and complications. And so the district court didn't go all the way as, as plaintiffs suggest and saying that these three minutes of air hunger are akin to having your chest crushed by an elephant or something like that. It's completely, uh, completely different. They can say suffocation technically oxygen deprivation, uh, could fall under some definition of suffocation, but no, the method is not like hanging or strangulation or poison gas because there's no physical obstruction of the airway. The method floods the lungs with nitrogen, which much more rapidly displaces oxygen and causes unconsciousness. And because of the free exchange of gases, which prevents CO2 buildup, which is another cause of discomfort. So we think that sentence doesn't apply. We think when they say suffocation, it's, it's misleading, um, or at best equivocation and, uh, and this is backed up by all the suicide evidence. So plaintiffs still have no answer to all the case reports about suicide, where authors watched someone inhale an inert gas to death with no sign of pain or distress. And we have eight of those through the Ogden articles, the Harding article and Dr. Nitschke's use of the Sarko pod. And the response at trial from Dr. Schwartzstein was, well, maybe helium is different and maybe the straps in the execution chamber are too tight. Well, there's, it's total speculation to say helium and nitrogen act differently. We also, I believe, have a nitrogen suicide in this record. And then the straps, we, we blew that up with many people who have tested the, um, the, the setup have said you can breathe normally and deeply on the gurney. And so is the state's view that hanging and use of cyanide gas in, in a gas chamber are unconstitutional methods? No, the, the, no, the state's not saying that we're just saying we're not close to, um, hanging because in hanging you have a physical obstruction of the neck and then often a prolonged period of oxygen deprivation that doesn't occur when you're rapidly replacing the lungs with another gas. I guess the reason I ask is, and I go, this goes to the questions that I asked your opposing counsel, what do we do with a comparison between those? In other words, it seems to me relevant if we're looking at, at, at super addition, what we're adding to. And so what is the baseline that we're looking at would seem to be a relevant question. And so tell me what you think is the, the most closest analogy or let me, let me rephrase that the worst form of execution for pain that is a consequent of it and how this compares to that, that that's the question I have. There are different kinds of pains and discomforts. And so I think the constitution doesn't distinguish between say the physical pain of being shot in the heart or, or the lung as sometimes happens, um, versus the emotional distress of, uh, nitrogen to the extent it does. I mean, we, we think that the methods that are cruel are always ones that have severe physical pain, but when we're comparing a short duration of physical pain versus a somewhat longer duration of emotional distress as the court found in, um, that, that comparison does not yield a constitutional violation. The state can't be required to inflict, uh, one versus the other. Um, we haven't briefed a ranking of the different methods. I guess I'm not asking for a ranking, but it seems to me that that hanging that is putting a rope around somebody's neck, um, would deprive somebody of oxygen for at least some period of time. Um, obviously I guess the ideal way would be that it completely severs the spinal cord for which someone, uh, uh, suddenly dies, but, um, that the Supreme court has acknowledged that that was not necessarily how it was done, um, for a large part of this country's history. And, and certainly in the gas chamber, there is not sudden death, um, from the moment gas is entering the chamber. And so I guess what I'm asking is to the extent those are constitutional methods, how does this compare to that? And how should we use those, those analogies to be able to decide whether there's super addition of pain for the first Bucklew element? Right. So, um, first on hanging the Bucklew page 132 says many, and perhaps most hangings were evidently painful because they caused death slowly. And so I think we've discussed that. How does nitrogen hypoxia compare? Well, it's much quicker. It doesn't involve a pain, physical pain on the neck. Um, and, and so it compares favorably. I think this court doesn't need to, uh, compare hanging. One thing it could do like the district court did was sort of draw two sets of, uh, draw a line between what we know is cruel burning at the stake, um, drawing and quartering, and then the constitutional methods like, uh, hanging lethal injection, electrocution, firing squad, et cetera. And, and nitrogen hypoxia falls comfortably on one side of the line. And you, uh, since you're talking about, you know, drawing and quartering so forth, did you have a chance to review the amicus brief filed by professor Steniford? I, I didn't spend much time with it. It just filed late last night, but I think what I didn't see. Right. He mentions, you know, it seems perhaps suffocation has a special, uh, place, uh, with regard to the eighth amendment to the extent that, um, it seems like there's a comparison there to, uh, one of those older ways of inflicting punishment that involve placing weights in the chest and it involves suffocation. Do you have any response to that? I think it proves our point. Nitrogen hypoxia is nothing like crushing a person's body with iron and while starving him for days at a time. Um, that's it. But to the extent that it causes suffocations, you would say it's not the suffocation. It's the fact that there are other physical effects that result from that type of punishment. Right. I didn't see a line from Blackstone that said any method that involves suffocation is per se cruel. And I, I thought what Judge Luck got out earlier about the Bayes, um, suffocation line. I mean, everyone knew that nitrogen hypoxia would involve suffocation. It's inherent, um, suffocation in the sense of oxygen deprivation. I mean, um, that's part of the method. So when, uh, Lee elected it, he knew that would be part of the method. Now, I think that has to be relevant on the equities, even if it's not a full basis for estoppel. But is it not also true that there are ways of, um, a protocol could have been developed in which, um, you wouldn't necessarily feel the effects of that. I believe I recall something in the briefing about an opioid as some sort of sedative being given at the beginning, which is not done in this case, but that could have been part of the protocols still resulting in the, um, and the oxygen deprivation, but perhaps in a way that is, uh, uh, that has less of the, uh, feeling of suffocation. So, so one of the state's interests in nitrogen hypoxia, which is also an answer to Judge Luck's question is to get away from the use of controlled substances, which have had known supply problems because of manufacturers being boycotted. And so, um, the state doesn't want to do that. I think many other methods don't. I understand the practical, um, considerations that why the state might not want to do it, but in terms of why, you know, why, um, the defendant might have elected that in the first place, I, I don't know that we can say that he necessarily envisioned this particular protocol. Would that be fair to say? Well, I don't know that the way it was, um, pleaded at the time, and I think it wasn't in Lee's complaint, but in the other consolidated cases, um, I don't believe it said that the inmate would necessarily be rendered unconscious beforehand. I believe there's a prescription for some pain medication, but I don't know if it contemplated unconsciousness and electrocution, firing squad, all of these methods involve a conscious inmate. Lethal injection is the only one that doesn't. And on their theory, even lethal injection may be unconstitutional because the unconscious brain is processing what's going on. Um, on firing squad, I think there are no findings in Lee's favor, obviously, but the district court rejected this exact method comparison in Boyd. And so he's not likely to succeed if the case were remanded. And this court affirmed, um, for the reason I said earlier about comparing physical versus psychological pains, uh, their expert had credibility problems because he's, uh, hired by one of the South Carolina inmates and, uh, didn't disclose that fact and then didn't discuss South Carolina, which has had the three most recent firing squad executions in the Michael Motti case. He was shot in the lung and in the wrong ventricle. And so we think that raises reliability questions for the method. And then we have a penological reason to reject the firing squad, which is that it requires five trained marksmen willing to serve as executioner, which is again, the kind of supply concern that led the state to move away from nitrogen hypoxia. They say we have no evidence to back that up, but both warden Raybon and one of the other ADOC employees testified that, uh, they didn't know if they could have five employees who were both skilled and willing to pull the trigger. There's a big difference between just being part of the execution team and being the one who supplies the lethal force. If we, if, if we disagree with you on the first aspects of Bayes, Glossop, et cetera, do we remand for the work that left to be done with regards to the firing squad as an alternative? We think the court could say that, uh, Lee is not likely to succeed on the firing squad for the reasons I've just given. Um, the court definitely should not in that case issue an injunction pending appeal because the district court hasn't had a chance to opine. So the remand is kind of the worst case scenario. This is, this is a, this is a weird procedural posture because we have both the stay pending appeal, but we also have the merits briefing from a final judgment. So it's, it's both issues, right? So if the state lost on, on the first prong, um, the, the court should still deny injunction pending appeal, but if it, if it doesn't, it could issue a limited remand. Um, and this is what rule eight is about. This is why you have to move for a stay. Uh, the district court might've had an opportunity to opine at that time. Certainly if there were any remand order, they would need to move the district court first before this court could, um, uh, opine on findings that don't exist and a comparison between methods that, that is, uh, not in the district court's order. So, um, there's a lot of work cut out for Lee on remand in that case, and he needs to persuade the district court, not this court. Um, and that goes, same goes for the Daubert issue too, that if we lose the state's expert, we think that there's, it's harmless error because the district court relied on his underlying data and the literature and evidence in the record beyond his expert opinion. But if the court were to remand, it shouldn't grant an injunction pending appeal. It should leave that decision to the district court, which knows the record best. Can you, can you help me Mr. Overling with just some understanding of mechanics of Alabama law with regards to the execution period? As I understand it, it runs from a point in time on the 11th to a point in time on the 12th. Is that correct? You know what? I don't have the time handy. It's at 6 p.m. Midnight on the 11th to, oh, to 6 a.m. on the 12th. Okay. So it spans what? Less than 24 hours, but two calendar days? Sorry, 36 hours, right? Oh, 36 hours. Okay. Okay. And does the state have a mechanism for extending that period? Or once that period runs as a matter of state law, the process has to start all over again. Correct. That process would need to start over again. Okay. If there are no further questions, the court should affirm and should deny an injunction pending appeal. Thank you. All right. Thank you very much, Mr. Overling. All right, Ms. Sharp, you've got your time for rebuttal. Thank you, Your Honor. Your Honor, the state's disagreement with the court's findings and facts is notable. They don't challenge them in their briefing, and so are bound by them. But much of my opposing counsel's argument today was based on underscoring disagreements with the court's findings. I think that indicates that the state is simply uncomfortable defending a method of execution that causes severe air hunger for one to three minutes. Opposing counsel also took issue with some of the descriptions of severe air hunger that were in our opening brief for our reply brief. But those descriptions are, in fact, taken directly from the district court's order, where she credited descriptions of air hunger that range from feeling starved for air, feeling like there is an elephant on your chest, feeling like you were going to collapse, the feeling of suffocation, a smothering feeling akin to drowning. Those all come directly from the court's order. They are all descriptions of air hunger that she credited. The court also found that air hunger is described as worse than pain. And just to go back to some of the questions that I was asked previously, I think that's one other thing that distinguishes nitrogen hypoxia from other methods of execution. People who experience this type of oxygen deprivation describe it as being worse than pain itself. Again, this was something that the court credited in her opinion. Where do you think the court has a long discussion of the testimony presented at trial and sometimes expresses views on the credibility or weight of that evidence? Sometimes it just recites it. And then it has a much shorter section at the end called findings of fact. So tell me the best place I can find support for your proposition that the court found that severe air hunger is worse than pain. So I think it's something that she credited. I agree that it's not in her findings of fact themselves. But what she does say in her findings of fact is that an inmate who is executed under the protocol experiences severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort. An inmate executed under the protocol consciously experiences air hunger and associated distress for not significantly more than one to three minutes. That is in her findings of fact. And so I think the state is bound by those findings. And it makes clear that what these people are experiencing goes far beyond just emotional distress, just psychological suffering. Opposing counsel also referred to previous cases that were decided involving nitrogen hypoxia methods of execution. Those cases were decided with a different standard of review in the preliminary injunction setting. And they were decided on a different evidentiary record. This is the first case that has developed evidence that nitrogen hypoxia causes conscious suffocation and where the district court has found as such. And your honor, I would actually just note that there is a reference, and I overlooked this previously, there is a reference in the findings of fact that many people find air hunger worse than pain. So there is that reference in the findings of fact section as well, your honor. Where is that? Do you have a page reference for that? It's the page 54 of the opinion, the paragraph at the bottom of the page. I see it. Thank you. Thank you, your honor. Because the district court incorrectly applied the law to the facts, we believe we met our burden with respect to prong one of the constitutional test. We believe that this court can also decide prong two based on the evidentiary record that was developed on the alternative method of execution of firing squad. That's based on the doctrine of constitutional fact. We cited that in our reply brief. Um, that evidentiary record includes testimony from Dr. Williams, the only expert in the case on gunshot wounds and ballistics, who testified that death execution by firing squad causes near immediate loss of consciousness. That testimony was unrebutted. And he testified as well that during the three to five seconds before loss of consciousness, there's essentially no pain that suffered. I thought the state indicated, Mr. Overing indicated that the state presented, maybe not on that precise point, but presented contrary evidence indicating that the firing squad was not an apt alternative. With respect to the feasibility and implementation of the firing squad, there was testimony from ADOC wardens. However, the ADOC commissioner himself was one of the defendants in the case, as well as the deputy commissioner testified to the contrary. They testified that they have the rifles and bullets that are needed. They testified that they have the ability to train employees on the use of those rifles. They testified that they could modify the execution chamber to account for firing squad executions and that they could train and staff members of the execution team to carry them out. So there is there's clear testimony in the record, both from Dr. Williams, that this is a painless method, and from witnesses from the state that this is feasible and readily implemented. So we believe the evidentiary record is clear that we've met our burden with respect to the alternative method as well. Your Honor, I see that I'm over time. I would ask that the court reverse the findings of the district court and enter judgment for Mr. Lee on both prongs of the test and grant a state of execution pending the resolution of his appeal. Thank you. All right. Thank you very much. Thank you both.